*1105·15*   *1106·15*

ORIGINAL

Oral argument requested

PD-1105-15 & PD-1106-15

IN THE TEXAS COURT OF CRIMINAL APPEALS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**DANIEL HERNANDEZ**
Appellant-Petitioner

v.

**THE STATE OF TEXAS**
Appellee-Respondent

RECEIVED IN
COURT OF CRIMINAL APPEALS

NOV 03 2015

Abel Acosta, Clerk

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

FROM THE SECOND COURT OF APPEALS
CAUSE NOS. 02-13-196-CR & 02-13-197-CR

APPEAL FROM THE 367TH JUDICIAL DISTRICT COURT
OF DENTON COUNTY, TEXAS
CAUSE NOS. F-2012-0920-E & F-2012-0923-E
THE HONORABLE MARGARET BARNES PRESIDING

FILED IN
COURT OF CRIMINAL APPEALS

NOV 03 2015

Abel Acosta, Clerk

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**APPELLANT'S PETITION FOR DISCRETIONARY REVIEW**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

By:
**Daniel Hernandez, Pro Se**
TDCJ-CID #1852714
Connally Unit
899 FM 632
Kenedy, Texas 78119

## GROUNDS FOR REVIEW

### Ground One

Whether, for purposes of determining whether there is sufficient evidence to support a conviction for aggravated assault under Tex.Pen.Code § 22.02(a)(2), there must be evidence that the defendant intended to threaten injury to the specific person named in the indictment, complainant, and knew that he had done so, or whether the threat may have arisen solely from the complainant's view of the circumstances and his conclusions about the intent of the accused.

### Ground Two

Whether the court of appeals erred when it found the evidence legally sufficient to support Appellant's conviction for aggravated assault under Tex.Pen.Code § 22.02(a)(2).

## TABLE OF CONTENTS

GROUNDS FOR REVIEW..................................................................ii

TABLE OF CONTENTS.................................................................iii

INDEX OF AUTHORITIES..............................................................iv

IDENTITY OF JUDGE, PARTIES, AND COUNSEL...........................................v

STATEMENT REGARDING ORAL ARGUMENT................................................vi

STATEMENT OF THE CASE............................................................vi

STATEMENT OF PROCEDURAL HISTORY..................................................vi

INTRODUCTION.....................................................................1

STATEMENT OF FACTS...............................................................2

ARGUMENT.........................................................................4

    **Ground One**

    For purposes of determining whether there is sufficient evidence to
    support a conviction for aggravated assault under Tex.Pen.Code §
    22.02(a)(2), there must be evidence that the defendant intended to
    threaten injury to the specific person named in the indictment,
    complainant, and knew that he had done so, and the threat, may not
    have arisen solely from the complainant's view of the circumstances
    and his conclusions about the intent of the accused....................4

    **Ground Two**

    The court of appeals erred when it found the evidence legally
    sufficient to support Appellant's conviction for aggravated assault
    under Tex.Pen.Code § 22.02(a)(2).....................................8

PRAYER FOR RELIEF................................................................9

DECLARATION......................................................................9

CERTIFICATE OF SERVICE..........................................................10

APPENDIX:  Second Court of Appeals Dissenting Opinion
            Second Court of Appeals Majority Opinion

# INDEX OF AUTHORITIES

**Cases**                                                                                    Page

Adkins v. State, 274 S.W.3d 870, 874 (Tex.App.—Fort Worth
    2008, no pet.)................................................................5

Elonis v. United States, 135 S.Ct. 2001, 2009 (2015)........................4

Fiore v. White, 531 U.S. 225, 228, 121 S.Ct. 712, 714 (2001)...............2

Jackson v. Virginia, 443 U.S. 307, 319-20 (1979)........................1, 8

Morissette v. United States, 342 U.S. 246, 250 (1952).....................2

Staples v. United States, 511 U.S. 600, 607 n. 3, 114 S.Ct. 1793, 1798
    n. 3 (1994)................................................................4

**FEDERAL CONSTITUTION**

U.S.CONST. amend. XIV......................................................1

**STATE STATUTES**

Tex.Pen.Code § 6.02(a).....................................................2

Tex.Pen.Code § 6.02(d).....................................................2

Tex.Pen.Code § 22.01(a)(2)..............................................4, 5

Tex.Pen.Code § 22.02(a)(2)...........................................passim

## IDENTITY OF JUDGE, PARTIES, AND COUNSEL

Appellant:                                              Mr. Daniel Hernandez
TDCJ-CID #1852714
Connally Unit
899 FM 632
Kenedy, Texas 78119

Appellant's Trial Attorney:        Mr. Stacey Mooring
Attorney at Law
701 N. Riverside, Suite E
Fort Worth, Texas 76111, Suite 3100

Appellant's Appeal Attorney:       Mr. David Wacker
Attorney at Law
P.O. Box 1142
Denton, Texas 76202

Trial Judge:                           Hon. Margaret Barnes
Judge, 367th District Court
Denton County Courts Bldg.
1450 E. McKinney
Denton, Texas 76201

State's Trial Attorneys:           Mr. Matthew Shovlin
Mr. Justin Jones
Assistant District Attorneys
1450 E. McKinney
Denton, Texas 76202

State's Appeal Attorney:           Mr. Charles Orbison
Appellate Attorney
Denton County District Attorney's Office
1450 E. McKinney
Denton, Texas 76202

## STATEMENT REGARDING ORAL ARGUMENT

This case raises important issues and distinctions regarding Tex.Pen. Code § 22.02(a)(2) and that statute's application to this case. Mr. Hernandez believes oral argument would help the Court understand and solve these problems.

## STATEMENT OF THE CASE

This appeal involves two cases from the 367th District Court of Denton County, Texas. On April 11, 2013, Appellant was convicted by a jury of aggravated assault with a deadly weapon and felon in possession of a firearm. (4 RR 181.) The jury assessed punishment at 63 years in prison on each term to run concurrently. (5 RR 26-28; 5 RR 33.)

Appellate counsel filed a Motion to Withdraw from the appeal of the gun conviction with an Anders' Brief. Mr. Hernandez filed a Brief in Opposition. The Second Court of Appeals affirmed the aggravated assault conviction with Justice Dauphinot dissenting in an 11-page dissent stating, "I would hold the evidence insufficient to support Appellant's conviction for aggravated assault." (See Attached Dissenting Opinion at 11.)

The court of appeals also concluded that the appeal of the gun conviction is wholly frivolous and without merit. (Attached Maj. Op. at 17.) The court granted counsel's Motion to Withdraw and affirmed the trial court's judgment in the gun case in cause number 02-13-00197-CR.

Mr. Hernandez here abandons his claims regarding the firearm conviction, but seeks discretionary review of the court of appeals majority opinion affirming the aggravated assault conviction and 63-year sentence.

## STATEMENT OF PROCEDURAL HISTORY

The court of appeals handed down its opinion on August 6, 2015 with Justice Dauphinot's dissent filed the same day. Daniel Hernandez v. State of

<u>Texas</u>, No. 02-13-196-CR, No. 02-13-297-CR (Tex.App.—Fort Worth). Mr. Hernandez did not file a motion for rehearing. This Court granted Mr. Hernandez an extension of time to file this Petition. This Petition is due by November 9, 2015.

| DANIEL HERNANDEZ, | § | CCA #PD-1105-15 |
| TDCJ-CID #1852714, | § | CCA #PD-1106-15 |
| | § | |
| Appellant-Petitioner, | § | |
| | § | |
| V. | § | COA #02-13-196-CR |
| | § | COA #02-13-197-CR |
| | § | |
| THE STATE OF TEXAS, | § | |
| | § | TC #F-2012-0920-E |
| Appellee-Respondent. | § | TC #F-2012-0923-E |

## APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

### INTRODUCTION

The State alleged in the indictment that Petitioner Daniel Hernandez "intentionally or knowingly threaten[ed] Indalacio Quintero with imminent bodily injury by pointing a firearm at Indalacio Quintero and threatening to shoot Indalacio Quintero, and did then and there during the commission of said assault, use or exhibit a deadly weapon, to-wit: a firearm." (1 CR 8.) As stated below, witnesses testified that Mr. Hernandez pointed a gun at Francisco San Miguel, but Francisco was not named as a complainant. The jury acquitted Mr. Hernandez of aggravated assault against another complainant and found him guilty of the lesser-included offense against the third complainant. All three complainants denied that Mr. Hernandez pointed a gun at them. The jury found Mr. Hernandez guilty of aggravated assault against Indalacio. Mr. Hernandez complained on appeal that the evidence was insufficient to support conviction for aggravated assault. The court of appeals affirmed. (See Attached Opinion and Dissenting Opinion.)

After viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979). The State is attempting to punish Mr. Hernandez under Tex.Pen.Code § 22.02(a)

(2) based on conduct that does not fall within the definition of that statute. A person does not commit an offense unless he or she engages in the proscribed conduct with the culpable mental state that the definition of the offense requires. See Tex.Pen.Code § 6.02(a) and (d) (West Supp. 2007).

A state cannot, consistently with the Due Process Clause, convict a defendant for conduct that its criminal statute, as properly interpreted, does not prohibit. See e.g. Fiore v. White, 531 U.S. 225, 228, 121 S.Ct. 712, 714 (2001); see also Morissette v. United States, 342 U.S. 246, 250 (1952) ("The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil").

## STATEMENT OF FACTS

Complainant Indalacio Quintero testified that he threw a trailer hitch at the back windshield of a Chevy extended-cab pickup truck while the truck drove passed him in the parking lot of his corn stand business. (3 RR 167-68; 3 RR 177.) According to testimony at trial, the person driving the truck was Mr. Hernandez, and he had been burning out in the parking lot and possibly screeching his tires. (See e.g. 3 RR 41-43, 120.) No one testified why Mr. Hernandez was in such a hurry to leave. Indalacio testified that he threw the trailer hitch at the truck twice, once at the door and once thru the back windshield before he saw—from inside the building—Mr. Hernandez outside the building with a gun. (3 RR 167-68, 177-79, 180-89; 3 RR 161-62, 166.)

Indalacio testified that before he threw the trailer hitch thru the windshield, Mr. Hernandez told him he was "going down." (3 RR 167.) When Indalacio saw him with the gun, he saw him point the gun at his friend. (3 RR

161.) Indalacio heard Mr. Hernandez say to his friend, "You're going down." (3 RR 161.) Upon seeing and hearing that, Indalacio concluded that Mr. Hernandez thought he was pointing at Indalacio. (3 RR 161.) He never pointed the gun at Indalacio. (3 RR 161-62.) Indalacio testified that he threw the trailer hitch at the truck because he wanted to draw Mr. Hernandez out of the truck to fight him. (3 RR 184.) Indalacio never saw Mr. Hernandez point the gun at anyone else except his friend. (3 RR 191-92.) Indalacio thought Mr. Hernandez was thinking while pointing the gun, "Which one of you is Lupe?" which is Indalacio's middle name, though Indalacio admitted Mr. Hernandez never actually asked that. (3 RR 166-70.)

His friend, Francisco San Miguel, testifed that Mr. Hernandez pointed the gun at him, not Indalacio. (3 RR 223.) Francisco's brother, Edgar San Miguel, testified that Mr. Hernandez pointed the gun at Francisco and several other customers. (3 RR 238.) Edgar could not identify Mr. Hernandez. (3 RR 240.) He testifed that the man with the gun at first left the parking lot and returned displaying the gun after Indalacio threw the hitch thru his windshield. (3 RR 253-54.)

It was undisputed that Indalacio was in the building when Mr. Hernandez was outside with a pistol. (See e.g. 3 RR 161-62, 166.) There was no scientific evidence obtained by the police. The jury acquitted Mr. Hernandez of the offense of aggravated assault against Edgar. (4 RR 181.) The jury also acquitted Mr. Hernandez of the offense of aggravated assault against Indalacio's wife and found him guilty of the lesser-included charge of deadly conduct assessing punishment at 365 days county jail. (4 RR 181; 5 RR 27.)

Mr. Hernandez's wife, Norma Hernandez, testified that their daughter was dating Brian, Indalacio's son. (See e.g. 3 RR 274-75.) As far as she knew, Mr. Hernandez had no problems with Indalacio. (3 RR 278.) Indalacio

testified that him and Mr. Hernandez had previous altercations. (3 RR 173.) Ms. Hernandez testified that she saw Mr. Hernandez with a gun the night of the incident before his arrest (3 RR 281) and that he said his daughters-in-law ambushed him. (3 RR 265-66.)

Indalacio's wife, Guadalupe Quintero, testified that her son and Indalacio came inside the building when her son came running saying, "He has a gun, he has a gun." (4 RR 17-18.) She never saw him point a gun at anyone. (4 RR 37-41.) She also confirmed that the truck drove thru once and then returned only once. (4 RR 16.)

While the police were at the corn stand, Mrs. Quintero received a call from her mother on her cell phone. Her mother said she heard noises like fireworks outside of the Quinteros' house. (4 RR 21.) When Mrs. Quintero got home, she found bullet holes in the grill and hood of a pickup truck parked in front of her house. No one was ever arrested for shooting at the pickup truck. Mr. Hernandez did not testify on his own behalf.

## ARGUMENT

### Ground One

For purposes of determining whether there is sufficient evidence to support a conviction for aggravated assault under Tex.Pen.Code § 22.02(a)(2), there must be evidence that the defendant intended to threaten injury to the specific person named in the indictment, complainant, and knew that he had done so, and the threat may not have arisen solely from the complainant's view of the circumstances and his conclusions about the intent of the accused.

"[A] defendant generally must 'know the facts that make his conduct fit the definition of the offense ....'" Elonis v. United States, 135 S.Ct. 2001, 2009 (2015) (quoting Staples v. United States, 511 U.S. 600, 607 n. 3, 114 S.Ct. 1793, 1798 n. 3 (1994)). A person commits aggravated assault when he or she intentionally or knowingly threatens another with imminent bodily injury while using or exhibiting a deadly weapon. Tex.Pen.Code Ann. § 22.01(a)(2)

(West Supp. 2014), § 22.02(a)(2) (West 2011); <u>Adkins v. State</u>, 274 S.W.3d 870, 874 (Tex.App.—Fort Worth 2008, no pet.).

The evidence presented at trial showed that Mr. Hernandez did not see who threw the trailer hitch at his truck twice. The evidence showed that he did not know that Indalacio was the person who threw the trailer hitch at his door and thru his back windshield. The evidence showed that he did not point the gun at Indalacio and that Indalacio was not even outside when Mr. Hernandez was outside with the gun. The evidence showed that Indalacio was afraid and hiding inside the building because he was the person that threw the trailer hitch at the truck for no justifiable reason. The evidence showed that Mr. Hernandez did not know that Indalacio was in the building. No rational juror could have found Mr. Hernandez guilty of the element of intent or knowledge.

In order for conviction to stand, Mr. Hernandez had to know complainant was present and that he was placing complainant in fear of bodily injury to be imminently inflicted on him. It's an essential element of the offense. Tex. Pen.Code Ann. §§ 22.01(a)(2), 22.02(a)(2). Complainant's own testimony shows that Mr. Hernandez's conviction for aggravated assault cannot stand:

Q. The first time, he drove through and burned his tires?

A. Yes, sir.

Q. Did you see him with a gun then?

A. No, sir. [3 RR 175.]

. . . .

Q. Did you see him point a gun at anybody then?

A. On that first time, no, sir.

Q. Did you—he threaten you with shooting you or putting down at time?

A. No. On that occasion he leaves and exits and does the same thing. [3 RR 176.]

....

Q.  And my question was not that, but my question is very simple. Did you—did you not tell this jury just a few minutes ago that [Appellant] never pointed a gun at you?

A.  Me, he never pointed it.

Q.  And he never threatened to kill you, did he?

A.  I imagine he didn't.  But if you go to my house and you see some shots down at my house, what can you think?  [3 RR 192.]

....

Q.  So when he comes back the second time, you approach the truck, you still didn't see a gun, did you?

A.  On the second time, that's when he starts burning again.

Q.  Did—did you see a gun?

A.  No sir.

Q.  Did you get threatened with a gun?

A.  On the second time, no.

Q.  Did he point a gun at you?

A.  No, sir.  [3 RR 177.]

....

Q.  [By Defense Counsel] So the second time, when the burnout, you threw a trailer hitch at the truck in order to get him out of the truck to confront you; is that right?

A.  Not to confront him, but to stop him so that he would stop driving that vehicle.  [3 RR 178.]

The court of appeals erred in its interpretation of Justice Dauphinot's Dissenting Opinion:

The dissent questions whether a threat of injury to a complainant "may arise solely from the complainant's view of the circumstances and his conclusions as to the intent of the accused." By this, we interpret the dissent as questioning whether testimony of the complainant that a threat occurred, standing alone, could be legally sufficient evidence to establish that the threat was made. We are not aware that corroboration is required to support complainant's testimony that he or she has been threatened by the accused.

(Maj. Op. at 12.)

Justice Dauphinot's Dissenting Opinion does not say this: "My dissent is apparently inartfully drafted because the majority does not understand it, believing it to require corroboration of a complainant's testimony that he or she has been threatened by the accused." (Dissenting Op. at 6.) What Justice Dauphinot is saying is that the issue was not whether or not complainant felt threatened. Just because he felt threatened does not mean he actually was threatened. In this case, there's a difference between feeling threatened and being threatened. He felt threatened because he knew he threw the hitch at the truck for no justifiable reason. He was not actually threatened because Mr. Hernandez didn't even know he threw the hitch at the truck. The other issue on appeal was whether or not Mr. Hernandez's conduct was accompanied by the requisite mental state: Whether Mr. Hernandez intentionally or knowingly threatened Indalacio Quintero with imminent bodily injury. The requisite mental states were not proven.

Indalacio speculated that Mr. Hernandez was looking for him. (3 RR 166-67.) Assuming _arguendo_ that this was true, the record does not show that he was looking for him to harm him in any way. He did not know which one was Indalacio. A rational juror would infer that Mr. Hernandez knew Indalacio owned the business. A rational juror would infer that at most, Mr. Hernandez was looking for Indalacio to complain to him that someone in his parking lot threw a trailer hitch at his truck twice and shattered his back windshield. A rational juror would infer that if Mr. Hernandez did peel out and tell Indalacio he was "going down," it was because Indalacio threatened him first and proceeded to attack him. (3 RR 164-66.) A rational juror would infer that Mr. Hernandez did not recognize Indalacio and unbeknownest to Mr. Hernandez, the man he sought for help was the man attacking him all along.

What Justice Dauphinot means is that complainant's speculative testimony that "he is pointing the pistol at my friend, but he thought he was me" (3 RR 162) is but a mere modicum of evidence of the requisite culpable mental state. What's more is that Indalacio didn't even hear Mr. Hernandez say, "Which one of you is Lupe?": "[H]e was pointing at them, like looking for me okay, which one of you is Lupe? He's not asking, but that's what I think he was thinking, to see who it was." (3 RR 166-67.) Indalacio was inside the building the whole time. A mere modicum of evidence is not sufficient to sustain a conviction:

> [A] mere modicum of evidence may satisfy a "no evidence" standard. Any evidence that is relevant, that has any tendency to make an element of a crime more probable than it would be without the evidence, could be deemed a "mere modicum." Although, it could not seriously be argued that such a "modicum" of evidence could by itself rationally support a conviction beyond a reasonable doubt.

Jackson v. Virginia, 443 U.S. at 320.

### Ground Two

> The court of appeals erred when it found the evidence legally sufficient to support Appellant's conviction for aggravated assault under Tex.Pen.Code § 22.02(a)(2).

In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to the verdict in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. at 319. For the reasons stated above and the reasons stated in Justice Dauphinot's Dissenting Opinion, no rational trier of fact could have found that Mr. Hernandez intentionally or knowingly threatened Indalacio Quintero with imminent bodily injury by pointing a firearm at Indalacio Quintero or threatening to shoot Indalacio. The court of appeals erred when it affirmed Mr. Hernandez's conviction for aggravated assault.

**PRAYER**

For these reasons, Appellant Daniel Hernandez respectfully asks the Court to grant discretionary review, appoint counsel, order further briefing and oral argument, and reverse his conviction and punishment with instructions to the trial court to enter a judgment of acquittal on the charge of aggravated assault. In the alternative, he asks the Court to enter any other order it finds appropriate.

SUBMITTED and SUBSCRIBED on this the _30_ day of _October_, 2015.

Respectfully submitted,

Daniel Hernandez, Pro Se
TDCJ-CID #1852714
Connally Unit
899 FM 632
Kenedy, Texas 78119

**DECLARATION**

"I, Daniel Hernandez, TDCJ-CID #1852714, presently incarcerated in the Texas Department of Criminal Justice Correctional Institutions Division at the Connally Unit in Karnes County, Texas, declare under penalty of perjury under Chapter 132 of the Texas Civil Practice and Remedies Code and 28 U.S.C. § 1746, that I have read this Petition for Discretionary Review, the facts stated in this Petition are true and correct, and I placed this Petition in the prison mailbox in a postpaid package on this day.

"Executed on this the _30_ day of _October_, 2015."

Daniel Hernandez

## CERTIFICATE OF SERVICE

I certify that on this the _30_ day of _October_, 2015, I served the following parties with a true and correct copy of this Petition for Discretionary Review by U.S. mail through the prison mailbox in a postpaid package to the addresses below:

Charles E. Orbison
Assistant Criminal District Attorney
1450 E. McKinney St., 3rd Floor
Denton, Texas 76209

State Prosecuting Attorney
P.O. Box 13046
Capitol Station
Austin, Texas 78711

Daniel Hernandez



**APPENDIX**



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-13-00196-CR
## NO. 02-13-00197-CR

DANIEL HERNANDEZ                                    APPELLANT

V.

THE STATE OF TEXAS                                  STATE

----------

FROM THE 367TH DISTRICT COURT OF DENTON COUNTY
TRIAL COURT NOS. F-2012-0920-E, F-2012-0923-E

----------

## DISSENTING OPINION

----------

Respectfully, I must dissent from the thoughtful majority opinion. The issue in this case is whether there must be evidence that the defendant intended to threaten injury to the specific person named in the charging instrument, the complainant, and knew that he had done so, or whether the threat may have arisen solely from the complainant's view of the circumstances and his

conclusions about the intent of the accused. The issue is not whether there is any way to construe Appellant's actions as threatening.

A person commits aggravated assault when he or she intentionally or knowingly threatens another with imminent bodily injury while using or exhibiting a deadly weapon.[1] Section 6.03 of the penal code defines culpable mental states:

> (a) A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

> (b) A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.[2]

The record is confusing at best. It appears that Complainant threw a portion of a metal towing hitch at the door of Appellant's pickup and then smashed out the pickup's back window because Appellant was "burning the tires" where several shoppers had gathered. Complainant testified,

Q.    The first time, he drove through and burned his tires?

A.    Yes, sir.

---

[1]Tex. Penal Code Ann. § 22.01(a)(2) (West Supp. 2014), § 22.02(a)(2) (West 2011); *Adkins v. State,* 274 S.W.3d 870, 874 (Tex. App.—Fort Worth 2008, no pet.).

[2]Tex. Penal Code Ann. § 6.03(a)–(b) (West 2011).

2

Q.   Did you see him with a gun then?

A.   No, sir.

. . . .

Q.   Did you see him point a gun at anybody then?

A.   On that first time, no, sir.

Q.   Did you—he threaten you with shooting you or putting you down at that time?

A.   No.  On that occasion he leaves and exits and does the same thing.

. . . .

Q.   And my question was not that, but my question is very simple. Did you—did you not tell this jury just a few minutes ago that [Appellant] never pointed a gun at you?

A.   Me, he never pointed it.

Q.   And he never threatened to kill you, did he?

A.   I imagine he didn't.  But if you go to my house and you see some shots down at my house, what can you think?

. . . .

Q.   So when he comes back the second time, you approach the truck, you still didn't see a gun, did you?

A.   On the second time, that's when he starts burning again.

Q.   Did you—did you see a gun?

A.   No, sir.

Q.   Did you get threatened with a gun?

A.   On the second time, no.

Q.   Did he point a gun at you?

3

A.    No, sir.

Complainant's testimony was hard to follow. He testified,

> Q.    (BY [Defense Counsel]) So the second time, when the burnout, you threw a trailer hitch at the truck in order to get him out of the truck to confront you; is that right?
>
> A.    Not to confront him, but to stop him so that he would stop driving that vehicle.

Complainant also testified that when Appellant got out of his truck after the final time he "burned the tires," Complainant went up to Appellant and asked him what his problem was. Appellant responded, pointing at Complainant, "You're going down." The majority interprets the same record as Complainant's not throwing the hitch until the third time Appellant "burned his tires," but Appellant's threatening him the second time. Unfortunately, we do not know whether "You're going down" means "You're going to go to jail," "I'm going to knock you down," or "I'm going to kill you." The statement is ambiguous and was never explained.

The State concedes that Appellant never directly threatened Complainant with a firearm, but argues,

> The evidence is sufficient to support a conviction of Aggravated Assault through transferred intent because Appellant pointed a firearm at Francisco San Miguel, who he thought was [Complainant]. The firearm alone could infer intent, but here intent could have been inferred from Appellant's words and conduct as well. Even if this Court does not find a transfer of intent, the evidence is still sufficient because Appellant pointed the firearm at everyone in the area. Since the victim was in the area, the firearm was therefore also pointed at him.

4

There are two problems with the State's argument. First, there is no evidence that Appellant thought Francisco San Miguel was Complainant. The nearest thing to evidence is Complainant's unfounded speculation:

Q. Did you ever see the Defendant with the gun?

A. From the inside of the building, and I kept my hands like this (indicating), holding the door down because I had my son that was coming. He was headed this way over here, like this (indicating). I was scared for my life because my son was also in there.

Q. But did you ever see the Defendant with the gun?

A. Yes. There's my truck, there's another vehicle, and then there's my friend. And he is pointing the pistol on my friend, but he thought he was me.

Q. And you saw this happen?

A. Yes, sir.

This speculation is the only thing that could be construed as evidence that Appellant thought he was pointing the gun at Complainant. Complainant also testified,

Q. All right. And going back to that night, did you ever see the Defendant get out of the truck?

A. No, because I was with a pregnant lady. I was doing something like getting inside the building. I thought he had left. And that's when my son comes in running, says that he got out of the vehicle, the truck was parked here, and that he had a—a pistol—the pistol. And he is putting it on the people here (indicating). And he walks this—over here, and that's where my friend was. And he puts the pistol on him. The lady was standing here, and I was in the building.

Q. What do you mean when you say he's putting it on people?

5

A.    (Indicating) That he was pointing at them, like looking for me, okay, which one of you is Lupe? He's not asking, but that's what I think he was thinking, to see who it was.

As for the State's argument that by pointing the gun at the crowd, Appellant was pointing it at Complainant because he was in the crowd, the record is clear that Complainant was not in the crowd. He had taken refuge inside the building.

Q.    Now, you testified to this jury that you saw him holding the gun?

A.    Yes, as far as I could see. Because in the building—in the building, there's an entrance here (indicating), and there is a window here that you can—you can see from. And between this window and this door, there is nothing where you can see through.

Q.    How did you feel when you saw him with the gun?

A.    (Crying) I was scared that he could kill me and leave my family by itself.

There is, however, no evidence that Appellant knew that Complainant was watching him. There is no evidence of what Appellant intended to accomplish. There is no evidence of what Appellant was saying, if anything, while he was pointing the gun at the crowd.

My dissent is apparently inartfully drafted because the majority does not understand it, believing it to require corroboration of a complainant's testimony that he or she has been threatened by the accused. Perhaps the Supreme Court of the United States has explained my position more clearly than I: "[O]ur cases have explained that a defendant generally must 'know the facts that make his

6

conduct fit the definition of the offense . . . ."[3] In this case, Appellant must have known that Complainant was present and that he was placing Complainant in fear of bodily injury to be imminently inflicted on him. It is an essential element of the offense.[4]

In a puzzling conclusion, the majority states that "[t]he totality of the evidence shows Appellant was hunting [Complainant] with a gun and was verbally threatening to take him down . . . in the location Appellant expected to find him."[5] There is no evidence, and the majority refers to none, that Appellant was "hunting [Complainant] with a gun."[6] Nowhere in the record does Appellant threaten "to take [Complainant] down"[7] while holding a firearm. As far as the peculiar statement that Appellant was making these fantasy threats "in the location Appellant expected to find [Complainant],"[8] nothing in the record supports this pronouncement. Perhaps the majority misunderstands the record.

The location the majority speaks of is a parking lot. This is not a huge Walmart parking lot. It is a parking lot that appears large enough to handle

---

[3]*Elonis v. United States*, 135 S. Ct. 2001, 2009 (2015) (citing *Staples v. United States*, 511 U. S. 600, 607 n.3, 114 S. Ct. 1793, 1798 n.3 (1994)).

[4]Tex. Penal Code Ann. §§ 22.01(a)(2), 22.02(a)(2).

[5]Maj. Op. at 11.

[6]*Id.*

[7]*Id.*

[8]*Id.*

twenty to twenty-five cars. The parking lot is a place people gathered to socialize, to buy corn, and to send packages to Mexico. It was full of people and cars and the place Appellant, for some reason, chose to "burn" his tires.

The majority makes much of the fact that Appellant was "in the location he expected to find" Complainant.[9] Nothing in the record tells us who or what Appellant expected to find, or whether, indeed, Appellant expected to find any specific person.

A building sits at each end of the parking lot, but only one is actually on the parking lot, the building that was the location of Complainant's corn business. Officer Acrey described the corn stand as a portable unit with a building behind it. Complainant described the building as "the business." The building is not a stand with an open counter. It is a building with a door and windows. Yet, the record mentions nothing about Appellant's going into Complainant's building, the logical place he would expect to find Complainant. There is no basis for the majority's speculation that Appellant expected to find Complainant out on the parking lot.

The majority then concludes that "[Complainant] was, in fact, there."[10] But Complainant was not out on the parking lot, which was the only place Appellant went, according to the record. Complainant was inside a building. The majority

---

[9] Id.

[10] Id.

8

says that "Appellant's inability to find [Complainant] in the crowd did not change Appellant's conduct."[11] But there is no evidence in the record that Appellant was searching for Complainant. The case law that the majority relies on goes not to the defendant's perception that the complainant feels threatened but only to the question of whether a complainant has been placed in fear when the defendant, unknown to the complainant, does a threatening act in preparation for assaulting the complainant. That is not the circumstance before this court. The majority's pronouncement that "[Complainant's] hiding, far from disproving the commission of the offense . . . proved its commission—it showed both the immediacy and the efficacy of the Appellant's threat"—[12] misses the point.

Nothing in the record suggests that Appellant was aware that Complainant was in a position to feel threatened or that Appellant had any intention of threatening Complainant. We may speculate that such was his intent, but our law requires evidence of each element of the offense, not conviction based on mere speculation. Appellant was pointing his gun at people on the parking lot, and in the direction of the corn business, but Complainant was not on the parking lot. What was the immediacy of the threat? How was Appellant to know he was placing Complainant in fear of immediate injury when there is no evidence that he knew Complainant was present?

---

[11] *Id.*

[12] *Id.*

9

It is possible that the shooting of Complainant's truck at his house could be considered a threatening message. The problem here, however, is the record. No one saw who did the shooting. Appellant did not take credit for the shooting. Although the shells collected from the truck were the same brand and caliber as those found at Appellant's home, there is no description of the gun that Appellant was carrying on the night in question. The majority concludes that Appellant did the shooting, but there is no evidence, more than mere speculation, that Appellant was the shooter.

Appellant was charged with and tried for a specific offense, aggravated assault of Complainant with a firearm. The State was required to prove the elements of that offense: that Appellant knowingly or intentionally threatened that person with a firearm. When asked if Appellant ever pointed the gun at him, Complainant answered, "No. Because when my son tells me that he has a pistol on him, I ran and I got inside the business." The two men had a history and a family connection such that the State argues that Appellant even knew where Complainant lived and recognized his pickup. Yet the State argues that, despite this history and family connection, Appellant could not tell the difference between Complainant and his friend San Miguel.

The evidence is clear that when Appellant returned to the parking lot where Complainant had dented Appellant's truck and broken out the window with the towing hitch, Complainant hid inside the building. Complainant speculated that Appellant mistook San Miguel for him, but there is no evidence of such a

10

mistake, and, other than Appellant's pointing the gun at someone else, no evidence of a threat of imminent harm to Complainant. Complainant also speculated that Appellant was asking the crowd where he was. If that speculation is evidence, it is evidence only that Appellant knew that Complainant was not present and, consequently, that he was not there for Appellant to threaten. Appellant could not believe, therefore, that he was threatening and placing Complainant in fear of death or serious bodily injury to be imminently inflicted.

I would hold the evidence insufficient to support Appellant's conviction for aggravated assault with a firearm. Because the majority does not, I must respectfully dissent.

/s/ Lee Ann Dauphinot
LEE ANN DAUPHINOT
JUSTICE

PUBLISH

DELIVERED: August 6, 2015

11



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-13-00196-CR
### NO. 02-13-00197-CR

DANIEL HERNANDEZ                                                        APPELLANT

V.

THE STATE OF TEXAS                                                          STATE

----------

FROM THE 367TH DISTRICT COURT OF DENTON COUNTY
TRIAL COURT NOS. F-2012-0920-E, F-2012-0923-E

----------

## OPINION

----------

Appellant Daniel Hernandez appeals his convictions for aggravated assault with a deadly weapon and for unlawful possession of a firearm. The jury assessed punishments of sixty-three years' confinement for each offense, which the trial court set to run concurrently. Appellant attacks the sufficiency of the evidence in the aggravated assault case. Appellate counsel asserted the appeal

in the unlawful possession case was frivolous. Appellant filed a pro se brief asserting it was not. We affirm both judgments.

## Evidence

Indalacio and Guadalupe Quintero were married. They owned a refreshment business, called Nikory's Korn, at 805 McKinney Street in Denton, Texas, in February 2012. They had a portable stand outside on the parking lot with tables and benches set out where customers could sit and eat. From the same parking lot, Francisco San Miguel operated a service whereby he and his brother, Edgar San Miguel, shipped care packages to Mexico. Francisco and Indalacio were friends.[1]

Around 9:00 p.m. on the Friday night of February 3, 2012, Appellant drove through the Nikory's Korn parking lot. Witnesses described Appellant as burning tires and peeling out, causing gravel to fly from his tires. Indalacio testified he was concerned because families were in the parking lot with perhaps as many as fifty to sixty people, including women and children, who "start[ed] running."

Shortly thereafter, Appellant drove through the Nickory's Korn parking lot a second time in the same manner. Indalacio said he asked Appellant, "[W]hat is going on? What's your problem?" Appellant responded by telling Indalacio, "You are going down," after which Indalacio told Appellant to get out of his pickup. Appellant's response was to burn his tires again. Indalacio picked up a tow hitch

---

[1]Indalacio, in his testimony, does not refer to Francisco by name but refers to him, instead, as "my friend."

from behind the corn stand and threw it at Appellant's pickup, hitting it on the driver's side door, and then he threw it a second time at Appellant's pickup's back window, shattering it, whereupon Appellant left the parking lot.

The third time Appellant returned, Edgar testified he saw Appellant get out of his pickup with a gun in his hand and walk towards Nikory's Korn. Appellant pointed the gun in the direction of the corn stand and Francisco. Edgar said Appellant never pointed the gun at him or threatened him.[2] Indalacio testified that his twelve-year-old son came running to him, very frightened, and said a man had pointed a gun at him and the "multitude that was there," and that the man had the gun on Indalacio's friend (contextually, Francisco). Indalacio twice said Appellant never pointed the gun at him, but when he heard Appellant had a gun, he was frightened because Appellant had told him he was "going down," so he ran inside his store in the building behind the corn stand.[3] From a window inside the building, Indalacio saw Appellant point the pistol at Francisco and heard Appellant say to Francisco, "You're going down; you're going down." Indalacio said he believed Appellant thought Francisco was Indalacio. "[H]e was

---

[2]The jury acquitted Appellant of the offense of aggravated assault against Edgar.

[3]The responding officer testified that Indalacio had told him the assailant had pointed the gun at him.

pointing at them, like looking for me, okay, which one of you is Lupe? He's not asking, but that's what I think he was thinking, to see who it was."[4]

Francisco testified and also expressed confusion over whether Appellant was threatening him or threatening Indalacio. Francisco said he hid behind a Suburban, and then Appellant got in his pickup and left. Guadalupe, Indalacio's wife, said she never saw Appellant point the gun at anyone because she was inside the building. Guadalupe said Appellant never pointed the gun at her or threatened her personally.[5]

About ten minutes later, someone went to the Quinteros' home, which was only about a mile away from Nikory's Korn, and shot up their pickup. Guadalupe said her twelve-year-old daughter told her someone knocked at the door, but her daughter did not answer it, and then her daughter heard something that sounded like fireworks.

Appellant's wife said Appellant came home that night and complained that her daughter's in-laws had ambushed him and damaged his pickup; she said

---

[4]Indalacio's full name was Indalacio Guadalupe Quintero. His wife's name was Guadalupe as well. Francisco referred to Indalacio as Lupe. Edgar knew Indalacio as Guadalupe. To keep the Quinteros straight during the testimony, Indalacio was referred to by his first name, but occasionally the witnesses referred to him as Lupe or Guadalupe.

[5]The State charged Appellant with aggravated assault against Guadalupe as well, but the jury found him guilty of the lesser-included offense of deadly conduct and assessed his punishment at 365 days' confinement in the county jail. Appellant did not appeal that conviction.

4

Appellant thereafter unloaded and then reloaded his gun and left the house. Contextually, Appellant was referring to the Quinteros: Guadalupe's brother and Appellant's wife's daughter were in a relationship.

Indalacio testified that he had seen Appellant before that night when two similar incidents had occurred, one of which involved physical contact, but he did not know Appellant's name. He said he later learned from his brother-in-law that Appellant had been constantly asking about him and wanting to know where he was and when. Indalacio concluded that the incident of February 3 was no coincidence but was "planned to hurt [him]."

**Aggravated Assault with a Deadly Weapon**

In a single point, Appellant contends the evidence is insufficient to support his conviction for aggravated assault with a deadly weapon against Indalacio. The State alleged in the indictment that Appellant "intentionally or knowingly threaten[ed] Indalacio Quintero with imminent bodily injury by pointing a firearm at Indalacio Quintero and threatening to shoot Indalacio Quintero, and did then and there during the commission of said assault, use or exhibit a deadly weapon, to-wit: a firearm." As was shown above, the evidence showed Appellant pointed a gun at Francisco and Indalacio's son. Neither is named as a complainant in any of the indictments. All three complainants denied Appellant pointed a gun at them, and the jury acquitted Appellant in one instance and found Appellant guilty of a lesser-included offense in the other. Only as to Indalacio did the jury convict Appellant as charged in the indictment.

## Standard of Review

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Dobbs*, 434 S.W.3d at 170. The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Dobbs*, 434 S.W.3d at 170. Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Instead, we determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict. *Sorrells v. State*, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011); *see* *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Dobbs*, 434 S.W.3d at 170.

We measure the sufficiency of the evidence by the elements of the offense as defined by the hypothetically correct jury charge for the case, not the charge actually given. *Byrd v. State*, 336 S.W.3d 242, 246 (Tex. Crim. App. 2011) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)); *see Crabtree v. State*, 389 S.W.3d 820, 824 (Tex. Crim. App. 2012) ("The essential elements of the crime are determined by state law."). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Byrd*, 336 S.W.3d at 246. The law as authorized by the indictment means the statutory elements of the charged offense as modified by the factual details and legal theories contained in the charging instrument. *See Daugherty v. State*, 387 S.W.3d 654, 665 (Tex. Crim. App. 2013); *see also Rabb v. State*, 434 S.W.3d 613, 616 (Tex. Crim. App. 2014) ("When the State pleads a specific element of a penal offense that has statutory alternatives for that element, the sufficiency of the evidence will be measured by the element that was actually pleaded, and not any alternative statutory elements.").

## Discussion

"[I]t is proper for an indictment to allege the ways an offense may have been committed in the conjunctive, and for those different ways to be charged to the jury in the disjunctive." *Garrett v. State*, 682 S.W.2d 301, 309 (Tex. Crim.

7

App. 1984), *cert. denied*, 471 U.S. 1009 (1985).[6] Consequently, although the State alleged in the indictment that Appellant "intentionally or knowingly threaten[ed] Indalacio Quintero with imminent bodily injury by pointing a firearm at Indalacio Quintero *and* threatening to shoot Indalacio Quintero," the jury charge properly asked the jury whether Appellant "intentionally or knowingly threaten[ed] Indalacio Quintero with imminent bodily injury by pointing a firearm at Indalacio Quintero *or* threatening to shoot Indalacio Quintero." (Emphasis added.) *See id.* (holding charge was not fundamentally defective when charge provided "by choking or strangling" while indictment alleged "by choking and strangling"); *see also Kitchens v. State*, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991) ("[A]lthough the indictment may allege the differing methods of committing the offense in the conjunctive, it is proper for the jury to be charged in the disjunctive."), *cert. denied*, 504 U.S. 958 (1992). The jury charge in this instance correctly used the disjunctive "or" and not the conjunctive "and."

Where the charge authorizes the jury to convict a defendant on more than one theory in the disjunctive, as it did here, we will uphold the verdict of guilt if the evidence was sufficient on any theory authorized by the jury charge. *Campbell v. State*, 426 S.W.3d 780, 786 (Tex. Crim. App. 2014). Indalacio twice

---

[6]*Garrett* used the "exclusion of reasonable hypotheses" test. *Id.* at 304. The Texas Court of Criminal Appeals later abrogated that construct. *Geesa v. State*, 820 S.W.2d 154, 161 (Tex. Crim. App. 1991), *overruled on other grounds*, *Paulson v. State*, 28 S.W.3d 570, 573 (Tex. Crim. App. 2000) (holding definition of "beyond a reasonable doubt" not required).

denied Appellant pointed the gun at him. We therefore focus on the second manner and means—whether Appellant threatened Indalacio by threatening to shoot him and whether during the commission of the assault he used or exhibited a deadly weapon.

The evidence, which was undisputed, viewed in the light most favorable to the verdict showed: (1) Even before the date of the offense, Appellant and Indalacio had two prior incidents, one of which involved physical contact; (2) upon Appellant's second drive-through in the parking lot outside Nikory's Korn, Indalacio challenged Appellant as to what his problem was; (3) Appellant told Indalacio in response that he, Indalacio, was "going down"; (4) Indalacio damaged the door on Appellant's pickup and broke out its back window; (5) when Appellant returned the third time, other witnesses observed that Appellant exited his pickup and walked toward Nikory's Korn with a gun in his hand; (6) not finding Indalacio at Nikory's Korn, Appellant went to Indalacio's house and shot up his pickup; and (7) Appellant's wife's testimony showed Appellant blamed the Quinteros (Indalacio) for the damage to his own pickup from the trailer hitch. From the evidence, the jury could reasonably have concluded that Appellant went back to Nikory's Korn the third time for the purpose of confronting Indalacio with a gun, but Indalacio, whose son had alerted him that Appellant was on his way and was armed with a gun in his hand, slipped into the building before Appellant located him.

9

When Appellant came upon Francisco and pointed the gun at him, Appellant appeared to have been confused by his inability to locate Indalacio. Indalacio, himself, watched from inside the building and said he believed Appellant "thought [Francisco] was me" but also described Appellant as "pointing at them, like looking for me, okay, which one of you is [Indalacio]?" Appellant's statements, "You're going down, you're going down," were threats that might have been addressed to Francisco, but again, viewing the evidence in the light most favorable to the verdict, the jury could reasonably have inferred that those threats were addressed to Indalacio because Appellant thought Francisco was Indalacio and had previously made the identical threat to Indalacio. Francisco himself expressed confusion over whether Appellant's threats with the gun were directed at him or at Indalacio. The jury could have then concluded that Appellant, not finding Indalacio at Nikory's Korn, then went to Indalacio's home, where he knocked on the door and, when no one answered, resorted to shooting Indalacio's pickup.

Indalacio testified that he felt threatened. He said he learned from his son that Appellant was looking for him, said he saw Appellant with the gun through the window, said he was scared for his life, and, on the stand, cried when he said, "I was scared that [Appellant] could kill me and leave my family by itself. I have worked so hard so that they can . . . do well, and . . . I could lose it all." Edgar also testified that he was scared as he saw Appellant walking toward the corn stand, first holding the gun down and then pointing it toward Francisco and

10

several other customers, and that he thought that "somebody was going to get shot and killed."

The totality of the evidence shows Appellant was hunting Indalacio with a gun and was verbally threatening to take him down in the area of Nickory's Korn, that is, in the location Appellant expected to find him. Indalacio was, in fact, there. Appellant's inability to find Indalicio in the crowd did not change Appellant's conduct. *See Landrian v. State*, 268 S.W.3d 532, 536 (Tex. Crim. App. 2008) (stating that assault by threat is a conduct-oriented offense which focuses upon the act of making a threat, regardless of any result that the threat may cause.); *Olivas v. State*, 203 S.W.3d 341, 347 (Tex. Crim. App. 2006) ("'[A]lthough the question whether the defendant's conduct produced fear in the victim is relevant, the crucial inquiry remains whether the assailant acted in such a manner as would under the circumstances portend an immediate threat of danger to a person of reasonable sensibility.'" (quoting *Anthony v. United States*, 361 A.2d 202, 206 (D.C. 1976))); *see also Montejano v. State*, No. 08-12-00235-CR, 2014 WL 4638911, at *6 (Tex. App.—El Paso 2014, no pet.) (not designated for publication) (holding that "the operative question is whether the defendant's conduct would be perceived as objectively threatening under the circumstances").

Indalacio's hiding, far from disproving the commission of the offense of assault by threat, proved its commission—it showed both the immediacy and the efficacy of Appellant's threat to Indalacio that he was "going down." The dissent

11

suggests that the words Appellant spoke to Indalacio could have meant that Indalacio was going to jail for damaging Appellant's truck with the trailer hitch or that Appellant was going to knock Indalacio down for doing so. But when Appellant first told Indalacio he was "going down," Indalacio had not yet damaged Appellant's truck. It was after the threat that Indalacio threw the trailer hitch at Appellant's truck twice, damaging Appellant's truck's back window as Appellant was leaving the parking lot.

The dissent questions whether a threat of injury to a complainant "may arise solely from the complainant's view of the circumstances and his conclusions as to the intent of the accused." By this, we interpret the dissent as questioning whether testimony of the complainant that a threat occurred, standing alone, could be legally sufficient evidence to establish that the threat was made. We are not aware that corroboration is required to support a complainant's testimony that he or she has been threatened by the accused. Indalacio positively testified, more than once, that Appellant told him he was "going down" before Appellant left the parking lot the second time. A short time later, Indalacio's son ran to him and told him that Appellant had returned and gotten out of his truck and was walking toward Indalacio's corn stand carrying a gun. Indalacio retreated inside the building behind the corn stand with his son to hide from Appellant. Indalacio and other witnesses saw Appellant brandishing the gun and walking toward the corn stand. Indalacio saw Appellant through a window, pointing the gun at his friend and the building, heard him make the

12

threat again and, not finding him, Appellant left and went to Indalacio's house where he shot up his truck. The jury was entitled to accept Indalacio's testimony on the stand as to Appellant's threat as his credibility was within the jury's sole province and there was no contrary evidence.

It was also within the jury's province to resolve any ambiguity or doubt that "You're going down" as meaning that Appellant intended to kill Indalacio (for whatever motive) based on Appellant's own actions in returning with a gun after making that threat and walking toward the corn stand, and the jury was entitled to infer from that conduct that Appellant was, indeed, looking for Indalacio to carry out his threat by shooting Indalacio, thereby taking him down. Indalacio's reaction of going into the building behind the corn stand and hiding himself and his son in fear that Appellant was going to carry out his threat was supported by testimony not only of Indalacio, himself, but also by other witnesses whose testimony the jury was entitled to accept. We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *See Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Dobbs*, 434 S.W.3d at 170.

Indeed, from the record, Appellant's threats and actions were not fantasies or imaginings only in Indalacio's head. Others saw Appellant, were afraid from his actions, and knew who he was. Indalacio's wife and others had called 9-1-1 by the time of Appellant's second drive-through of the parking lot; witnesses were questioned and statements taken by the police detective; and Appellant, who had

13

fled after apparently scaring everyone in the area with his conduct and the gun he was waving around, was captured a short time later hiding in a building not far from the location of the corn stand.

Finally, the dissent argues that there is no evidence of what Appellant intended to accomplish, that is, no evidence that Appellant was hunting Indalacio with a gun in the location in which he expected to find Indalacio. To the contrary, witnesses saw Appellant going toward Nikory's Korn and pointing the gun in the direction of the corn stand. This was the area of Indalacio's business where Indalacio could be expected to be found and where Appellant, himself, had found Indalacio earlier when he made the threat that Indalacio was going down. Indalacio testified that, from inside the building behind the corn stand where he was hiding, he could see out the window that Appellant had the gun and "was headed this way over here . . . ." As to whether Appellant was "hunting" Indalacio, the jury could have credited Indalacio's testimony that there had been two prior incidents involving Appellant and that Indalacio learned later, after the events of that night, that Appellant had been constantly asking about him, where he had been and when, and that the events were not coincidental but planned to hurt him.

"[P]roof of a culpable mental state generally relies on circumstantial evidence." *Dillon v. State*, 574 S.W.2d 92, 94 (Tex. Crim. App. [Panel Op.] 1978); *Varnes v. State*, 63 S.W.3d 824, 833 (Tex. App.-Houston [14th Dist.] 2001, no pet.); *see Lane v. State*, 763 S.W.2d 785, 787 (Tex. Crim. App. 1989)

14

("Establishment of culpable mental states is almost invariably grounded upon inferences to be drawn by the factfinder from the attendant circumstances."). Intent may be determined from a defendant's words, acts, and conduct, and "is a matter of fact, to be determined from all of the circumstances." *Smith v. State*, 965 S.W.2d 509, 518 (Tex. Crim. App.1998).

We hold the evidence was sufficient for a rational trier of fact to have found beyond a reasonable doubt that Appellant intentionally or knowingly threatened Indalacio with imminent bodily injury by threatening to shoot Indalacio and that during the commission of the assault, he used or exhibited a deadly weapon.[7] *See Jackson*, 443 U.S. at 319; *Dobbs*, 434 S.W.3d at 170; *see also Kitchens*, 823 S.W.2d at 258 ("It is appropriate where the alternate theories of committing the same offense are submitted to the jury in the disjunctive for the jury to return a general verdict if the evidence is sufficient to support a finding under any of the theories submitted."). We overrule Appellant's sole point and affirm the judgment in cause number 02-13-00196-CR.

### Unlawful Possession of a Firearm by a Felon

Appellant's court-appointed appellate counsel filed a motion to withdraw as counsel and a brief in support of that motion in related cause number 02-13-00197-CR. Counsel's brief and motion meet the requirements of *Anders v.*

---

[7]Because the evidence is sufficient without the application of a transferred intent, we do not reach that portion of Appellant's brief. *See* Tex. R. App. P. 47.1.

15

*California*, 386 U.S. 738, 87 S. Ct. 1396 (1967), by presenting a professional evaluation of the record showing why there are no arguable grounds for relief. In compliance with *Kelly v. State*, 436 S.W.3d 313, 319 (Tex. Crim. App. 2014), counsel notified Appellant of his motion to withdraw, provided him a copy of the brief, informed him of his right to file a pro se response, informed him of his pro se right to seek discretionary review should this court hold the appeal is frivolous, and took concrete measures to facilitate Appellant's review of the appellate record.

Appellant filed a pro se brief.[8] Appellant asserts the prosecutor relied on perjured testimony and, effectively, there was insufficient evidence to show he used or exhibited a weapon. Appellant also complains about the admission of testimony for which there was no objection and about the effectiveness of trial and appellate counsel.

---

[8]On March 19, 2014, this court by letter instructed the trial court to make the record available to Appellant. On April 23, 2014, Appellant filed a pro se motion to extend time to file his brief in which he complained about not having volume two (voir dire) and volume five (final arguments and verdict) of the reporter's record. This court's April 25, 2014 order granted Appellant's motion to extend time but did not address his complaint regarding the missing portions of the record. In an April 30, 2014 letter to this court, Appellant again complained about not having access to volumes two and five of the reporter's record. It is our understanding that the trial court clerk sent the entire record to Appellant again on or about May 1, 2014. In his July 21, 2014 brief, Appellant does not complain about having an incomplete record.

16

As a reviewing court, we must conduct an independent evaluation of the record to determine whether counsel is correct in determining that the appeal is frivolous. *See Stafford v. State*, 813 S.W.2d 503, 511 (Tex. Crim. App. 1991); *Mays v. State*, 904 S.W.2d 920, 923 (Tex. App.—Fort Worth 1995, no pet.). Only then may we grant counsel's motion to withdraw. *See Penson v. Ohio*, 488 U.S. 75, 82–83, 109 S. Ct. 351 (1988).

We have carefully reviewed the record, counsel's brief, and Appellant's pro se brief. We agree with counsel that this appeal is wholly frivolous and without merit; we find nothing in the record that arguably might support an appeal. *See Bledsoe v. State*, 178 S.W.3d 824, 827–28 (Tex. Crim. App. 2005). Accordingly, we grant counsel's motion to withdraw and affirm the trial court's judgment in cause number 02-13-00197-CR.

/s/ Anne Gardner
ANNE GARDNER
JUSTICE

PANEL: LIVINGSTON, C.J.; DAUPHINOT and GARDNER, JJ.

DAUPHINOT, J., filed a dissenting opinion.

PUBLISH

DELIVERED: August 6, 2015

17